UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*FILED*

MAR 1 4 2007

EUGENE R. WEDOFF
BANKRUPTCY JUDGE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COMMERCIAL LOAN CORP., | ) | No. 04 B 18946 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| CLC CREDITORS' GRANTOR TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06 A 1530 |
| | ) | |
| SONNENSCHEIN NATH & ROSENTHAL | ) | |
| LLP; KENNETH G. KOLMIN; GORDON P. | ) | |
| PAULSON; and THOMAS McQUEEN, | ) | |
| | ) | |
| Defendants. | ) | Judge Goldgar |

## MEMORANDUM OPINION

This adversary proceeding is before the court on the defendants' motion to dismiss the

plaintiff's complaint under Rule 12(b)(6), Fed. R. Civ. P. 12(b)(6) (made applicable by Fed. R.

Bankr. P. 7012(b)). The plaintiff is CLC Creditors' Grantor Trust (the "Trust"), a trust created

by the confirmed plan of debtor Commercial Loan Corporation ("CLC"). The defendants are

Sonnenschein Nath & Rosenthal LLP ("SNR"), a Chicago law firm, and Kenneth G. Kolmin,

Gordon P. Paulson, and Thomas McQueen, partners in the firm. SNR served as outside general

counsel to CLC before it sought bankruptcy protection in 2004.

The complaint alleges that CLC was ostensibly in business as an originator and servicer

of commercial real estate and personal property loans and sold participations in the loans to local

banks. In fact, the Trust says, CLC was engaged in a scheme under which it sold participations

in loans that were already 100% sold, used loan proceeds for unauthorized and improper

purposes, and failed to remit loan proceeds to the participant banks. SNR, Kolmin, Paulson, and

McQueen allegedly assisted CLC in its scheme. In Count I, the Trust seeks damages for the

defendants' actions in aiding and abetting CLC's breaches of fiduciary duty. Count II requests

turnover of a retainer CLC paid SNR for work in connection with CLC's bankruptcy, a retainer

the Trust says SNR did not earn. Count III is a fraudulent transfer claim seeking fees that CLC

paid SNR to perform legal services, not for CLC, but for CLC's president, Peter Hueser.

For the reasons that follow, the defendants' motion will granted in part and denied in part.

The motion will be granted as to Count I, and Count I will be dismissed – but on grounds other

than those the defendants raise. The motion to dismiss Counts II and III will be denied.

### 1. Jurisdiction

The court has subject matter jurisdiction over Counts II and III of the complaint pursuant

to 28 U.S.C. § 1334(a) and the district court's Internal Operating Procedure 15(a). The claims in

those counts are core proceedings. 28 U.S.C. §§ 157(b)(2)(E), (H). As for Count I, a court

always has jurisdiction to determine its jurisdiction. *Gladney v. Pendleton Corr. Facility,* 302

F.3d 773, 775 (7th Cir. 2002).

### 2. Facts

The following abbreviated version of the facts is drawn from the complaint and from

materials in the record of the CLC bankruptcy. *See Palay v. United States,* 349 F.3d 418, 425 n.5

(7th Cir. 2003) (stating that in resolving a Rule 12(b)(6) motion, a court "is entitled to take

judicial notice of matters in the public record"). For purposes of the motion to dismiss, all facts

alleged in the complaint are taken as true. *Savory v. Lyons,* 469 F.3d 667, 670 (7th Cir. 2006).

-2-

### a. CLC and SNR

CLC was primarily in the business of originating and servicing commercial real estate and personal property loans. In the vast majority of cases, CLC sold participation interests in the loans to banks, entering into Loan Participation Sale and Trust Agreements with those banks. Under the Participation Agreements, the banks obtained an equitable interest in the loans. CLC retained legal title to the loans, acted as servicer, and was obligated to remit the proceeds to the banks. As of December 1, 2004, some thirteen banks owned participation interests in CLC loans with balances of more than $70 million.

SNR began representing CLC at least as early as December 2001 and became CLC's outside general counsel in March 2003. In 2002, SNR represented CLC in connection with several large loans to Ingenium Packaging Corp. and Continental Container LLC (collectively "Ingenium"). All told, CLC loaned Ingenium more than $15 million. By March 2004, Ingenium owed CLC roughly $20 million.

CLC and its president, Peter Hueser, came up with the funds to lend Ingenium through a simple diversion scheme. When loans in which the banks had participations were paid, Hueser lent the proceeds to Ingenium instead of paying them to the participant banks. Because CLC was the record owner of the loans, the banks were unaware that the loans had been paid and so were unaware of the diversion. As of May 2003, Hueser had diverted more than $15 million in proceeds belonging to the participant banks and loaned those proceeds to Ingenium. The alleged point of the scheme was "to earn additional fees for CLC by making ever increasing loans to Ingenium."

But Ingenium was unable to repay the loans, and CLC found itself in serious financial trouble as a result. The complaint details two diversionary transactions CLC used to keep itself

-3-

afloat and its scheme alive. In the first, CLC obtained a short term, $1.3 million loan from Lakeside Bank, pledging as collateral the proceeds of a loan CLC had made to 7410 Winchester LLC. But the proceeds were not CLC's to pledge: participations constituting a 60% interest in the loan had already been sold. When Winchester paid off the loan in April 2004, all of the proceeds nevertheless went to Lakeside.

The second transaction involved CLC's sale of seven mortgage loans totaling approximately $3.6 million to an entity called JDI Loans. At least five of the loans were subject to participations CLC had previously sold, and CLC's agreement with JDI required CLC to use all of the purchase price to "pay amounts owed to any of its participants." When the sale of the seven mortgage loans closed, however, CLC paid the entire $3.2 million purchase price to a single participant, Umbrella Bank, although that bank's interest was only $243,000.[1/]

Eventually, the entire scheme collapsed. The participant banks began to express dissatisfaction with CLC's handling of the loans, complaining in late 2003 and early 2004 that CLC was not honoring its obligations under the Participation Agreements. (One participant bank threatened legal action after CLC extended the maturity date of a loan in violation of the Participation Agreement.) In early 2004, the FDIC and OTS began investigating CLC and Hueser. Federal authorities undertook a criminal investigation of Hueser, as well.

According to the complaint, SNR, Kolmin, Paulson, and McQueen were heavily involved in the unsavory activities of CLC and Hueser. SNR advised CLC in connection with the Participation Agreements and represented CLC in the Ingenium loan transactions. Kolmin knew that Ingenium was unable to repay the loans it received from CLC and that CLC was in serious

---

[1/]     The JDI transaction is discussed in more detail in *In re Commercial Loan Corp.*, 316 B.R. 690, 693-94 (Bankr. N.D. Ill. 2004).

financial trouble. Kolmin repeatedly assured complaining participant banks that CLC was complying with the Participation Agreements although it was not. McQueen advised CLC to pay the proceeds of the Winchester loan to Lakeside although he knew about Hueser's diversion scheme and knew the loans were subject to participations. SNR represented CLC in the JDI transaction, held the $3.2 million in escrow, and disbursed the $3.2 million to Umbrella Bank although the firm knew that the loans sold to JDI were subject to participations.

SNR's representation of CLC and Hueser continued as the scheme unraveled. McQueen and Kolmin represented Hueser in connection with the FDIC and OTS investigations, and McQueen discussed Hueser with members of the U.S. Attorney's Office in Chicago. Although these legal services were personal to Hueser, SNR billed CLC $127,451 for them, and CLC paid the bills.[2]

### b. The CLC Bankruptcy and Plan

In May 2004, CLC sought bankruptcy protection under chapter 11. SNR filed the petition and received a total of $300,000 as a retainer for its expected work in the bankruptcy case.[3] Within a week of the petition's filing, four of the participant banks moved for appointment of a chapter 11 trustee, as did the U.S. Trustee with the agreement of CLC. The U.S. Trustee's motion was granted, and a chapter 11 trustee was appointed.

Although SNR prepared the petition and filed some initial papers for CLC post-petition,

---

[2]     Hueser was indicted, pled guilty to two counts of bank fraud, and was sentenced to eight years imprisonment. *See United States v. Hueser,* No. 06 CR 470 (N.D. Ill. Nov. 1, 2006). He was also ordered to pay $18.4 million in restitution to ten participant banks. *Id.*

[3]     Different lawyers from SNR filed the petition. The individual defendants here were apparently not involved.

SNR was never retained as CLC's counsel in the bankruptcy. Indeed, no retention application was even filed. SNR subsequently disgorged to the chapter 11 trustee $126,315 of the $300,000 pre-petition retainer it had received.

In October 2004, seven of the participant banks filed a proposed plan and a disclosure statement in the bankruptcy. On December 1, 2004, the court approved the banks' proposed Third Amended Disclosure Statement (the "Disclosure Statement"). Two weeks later, over the objection of the chapter 11 trustee, the court confirmed the banks' proposed Second Amended Plan of Liquidation (the "Plan").

The Plan provides that upon confirmation, all property of the CLC bankruptcy estate vests in a Creditors' Trust – the plaintiff Trust in this adversary proceeding – created pursuant to a separate Creditors' Grantor Trust Agreement. (Not surprisingly, the trustees of the Trust are participant banks.) The Trust Agreement confers on the trustees the power, among other things, to sell assets of the estate and pay allowed claims in accordance with the Plan. The Plan contemplates distributions to the holders of "allowed claims" (a defined term) from property that the Trust holds or obtains.

The Plan also addresses claims and causes of action of the CLC bankruptcy estate. Article VI, section 6.2 includes in the estate, and vests in the Trust, "all claims, causes of action and Debtor's Insurance Rights." Section 9.7 of Article IX gives the Trust "the right, power and authority after Confirmation to commence any preference, fraudulent conveyance or other litigation (collectively referred to as the 'Avoidance Actions') it deems appropriate against any person or entity."[4] Article XIX then provides for "Retention of Causes of Action":

_____

[4]     The Plan has a fair degree of redundancy. In addition to section 6.2, for example, section 9.1 declares that upon confirmation the Trust is vested with all estate assets, "including

The Creditors' Trust is hereby appointed as the exclusive
representative of Debtor for any and all claims and causes of action
constituting Estate Assets against third parties, including Debtor's
Insurance Rights . . . . Such claims and causes of action shall be
retained by the Creditors' Trust and shall survive and be unaffected
by Confirmation of this Plan.

### 3. Discussion

SNR, Kolmin, Paulson, and McQueen move to dismiss all three counts of the Trust's

complaint principally on *res judicata* grounds. The defendants correctly note that the order

confirming the Plan was a final order and was *res judicata*. Citing *D & K Properties Crystal*

*Lake v. Mutual Life Ins. Co. of N.Y.*, 112 F.3d 257 (7th Cir. 1997), they then argue that the Plan's

reservation of claims was not specific enough to exempt the Trust's claims here from the

confirmation order's preclusive effect, and so the Trust's complaint is barred.

The breach of fiduciary duty claim in Count I presents no opportunity to address the

defendants' *res judicata* argument. That count must be dismissed for a more fundamental

reason: lack of subject matter jurisdiction. The court has no power to hear a state law claim that

a confirmed chapter 11 plan has transferred to a liquidating trust.[5] On Counts II and III,

---

without limitation all claims, causes of action and Debtor's Insurance Rights." And section 9.9
of Article XI appoints the Trust as the exclusive representative of the debtor and estate for the
"investigation, prosecution and settlement" of the causes of action retained under Article XIX.

[5]    The defendants offer three alternative arguments for dismissing Count I: (1) the
Trust has no standing to pursue the claim (because the claim belongs to the participant banks,
and a trustee cannot pursue a claim personal to fewer than all creditors, *see Koch Ref. v. Farmers
Union Cent. Exch., Inc.*, 831 F.2d 1339, 1348-49 (7th Cir. 1987)); (2) CLC sustained no loss
from the alleged breach (another form of standing argument); and (3) Illinois does not recognize
a claim against a lawyer for aiding and abetting a client's breach of fiduciary duty (a questionable
assertion after *Thornwood, Inc. v. Jenner & Block,* 344 Ill. App. 3d 15, 28-29, 799 N.E.2d 756,
768 (1st Dist. 2003), and *Hefferman v. Bass,* 467 F.3d 596, 601 (7th Cir. 2006), which accepts
*Thornwood* as a current statement of Illinois law). Since Count I will be dismissed on
jurisdictional grounds, these arguments need not be addressed.

however, the *res judicata* argument must be rejected. The defendants were not parties to the

bankruptcy case, and they have no right to complain about the specificity of the Plan's

reservation of claims – on *res judicata* grounds or otherwise.

### a. Count I

The court is obligated to dismiss Count I of the Trust's complaint for lack of subject

matter jurisdiction. The claim in that count does not arise under title 11, does not arise in a case

under title 11, and is not "related to" a case under title 11. 11 U.S.C. § 1334(b).

Subject matter jurisdiction is a threshold question, "the first question in every case," *State

of Ill. v. City of Chi.,* 137 F.3d 474, 478 (7th Cir. 1998), because without jurisdiction the "court

cannot proceed at all," *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94 (1998) (internal

quotation omitted).[6] It is not enough that a debtor's confirmed plan purports to confer

jurisdiction over particular matters, as Article XI of the Plan here does. *See Zerand-Bernal

Group, Inc. v. Cox,* 23 F.3d 159, 163-64 (7th Cir. 1994); *see also Shapo v. Engle,* 463 F.3d 641,

645 (7th Cir. 2006) (noting that "[p]arties cannot confer federal jurisdiction by agreement"). The

requirements of section 1334(b) must still be met. *S.N.A. Nut Co. v. Häagen-Dazs Co. (In re

S.N.A. Nut Co.),* 206 B.R. 495, 500 (Bankr. N.D. Ill. 1997).

Bankruptcy jurisdiction exists over claims that either arise under title 11 or that arise in

or are "related to" a case under title 11. 28 U.S.C. § 1334(b). The Trust's claim in Count I

---

[6]      As a consequence, a federal court has a duty to examine its own subject matter
jurisdiction, *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541 (1986), even where, as
here, the parties have not questioned it, *Smith v. American Gen. Life & Accident Ins. Co.,* 337
F.3d 888, 892 (7th Cir. 2003). "[N]ot only may the federal courts police subject matter
jurisdiction *sua sponte,* they must." *Hay v. Indiana State Bd. of Tax Comm'rs,* 312 F.3d 876,
879 (7th Cir. 2002).

-8-

plainly does not arise under title 11 because it is a state law claim, not a claim "created or

determined by a statutory provision of title 11." *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96

(5th Cir. 1987); *see, e.g., Federalpha Steel LLC Creditors' Trust v. Federal Pipe & Steel Corp.

(In re Federalpha Steel, LLC)*, 341 B.R. 872, 880 (Bankr. N.D. Ill. 2006) (holding that a

liquidating trust's state law claims did not arise under title 11). It is equally plain that the claim

in Count I does not arise in a case under title 11: it does not concern "administrative matters that

arise *only* in bankruptcy cases." *Wood*, 825 F.2d at 97 (internal quotation omitted) (emphasis in

original); *see, e.g., Federalpha Steel*, 341 B.R. at 880 (holding that a liquidating trust's state law

claims did not arise in a case under title 11). The question, then, is whether the claim in Count I

is "related to" the CLC bankruptcy.

It is not. Under the Seventh Circuit's constricted interpretation of "related to"

jurisdiction, a dispute is "related to" a bankruptcy only if "the dispute affects the amount of

property for distribution [i.e., the debtor's estate] or the allocation of property among creditors."

*In re Fedpak Sys., Inc.*, 80 F.3d 207, 213-14 (7th Cir. 1996) (internal quotation omitted). A

dispute's mere overlap with the debtor's affairs is not enough. *Home Ins. Co. v. Cooper &

Cooper, Ltd.*, 889 F.2d 746, 749 (7th Cir. 1989). Ordinarily, then, the damage claims of one non-

debtor against another are not matters over which the bankruptcy court has jurisdiction. *See, e.g.,

In re O'Malley*, 252 B.R. 451, 458-59 (Bankr. N.D. Ill. 1999) (dismissing a non-debtor's fraud

claims against other non-debtors for lack of jurisdiction); *Wayne Film Sys. Corp. v. Film

Recovery Sys. Corp.*, 64 B.R. 45, 52-53 (N.D. Ill. 1986) (dismissing a creditor's damage claims

against third parties as neither "arising in" nor "related to" bankruptcy).

After confirmation of a chapter 11 plan, moreover, "related to" jurisdiction is "sharply

reduced." *Cytomedix, Inc. v. Perfusion Partners & Assocs., Inc.*, 243 F. Supp. 2d 786, 789 (N.D.

Ill. 2003); *see Pettibone Corp. v. Easley,* 935 F.2d 120, 122 (7th Cir. 1991). On confirmation, the bankruptcy estate ceases to exist unless the plan provides otherwise. *In re T.S.P. Indus., Inc.,* 117 B.R. 375, 377 (Bankr. N.D. Ill. 1990). Post-confirmation "related to" jurisdiction is therefore appropriate "only to ensure that reorganization plans are implemented and to protect estate assets devoted to implement the confirmed plan." *Cytomedix,* 243 F. Supp. 2d at 789. Once assets have left the estate, the bankruptcy court's jurisdiction to decide disputes about them lapses. *FedPak,* 80 F.3d at 214.

The Trust's recovery on the claim in Count I will not affect the amount of estate property distributed to creditors in the CLC bankruptcy. Claims belonging to the bankruptcy estate were themselves estate property, *see Polis v. Getaways, Inc. (In re Polis),* 217 F.3d 899, 901 (7th Cir. 2000), and under the Plan those claims were transferred to the Trust at confirmation. At that point, they no longer belonged to the estate. Because all property has been distributed, the Trust's recovery on Count I can have no effect on the amount of estate property distributed to creditors.[2] *See Fedpak,* 80 F.3d at 214; *Zerand-Bernal,* 23 F.3d at 162. The property may later turn out to be worth more or less, depending on how successful litigation of the claim turns out to be, and creditors may ultimately receive more or less as a result. But that possibility is not enough to confer jurisdiction. *See Federalpha Steel,* 341 B.R. at 880-81.

For the same reason, the Trust's recovery on the claim in Count I will not affect the allocation of estate property among creditors. Again, all property, including claims, has been

---

[2]        It would be another matter if the Plan provided for the continuation of the bankruptcy estate and said the Trust's recovery on the claim became part of the estate. *See S.N.A. Nut Co.,* 206 B.R. at 499-501 (finding "related to" jurisdiction where confirmed chapter 11 plan specified that any recovery from litigation would remain in the debtor's estate pursuant to section 1141(b)). But it does neither.

distributed. Anything creditors receive from the Trust's recovery on claims that belonged to the CLC bankruptcy estate will be distributions of Trust property, not estate property. (And even if this were not so, the allocation of any recovery has been decided: Article XIX says funds recovered will be distributed to the holders of allowed claims in accordance with the Plan.) Once the claims were transferred to the Trust on confirmation, there could no longer be a question of allocation of estate property among creditors any more than there could be a question of the amount of estate property to be distributed. Jurisdiction over those claims ended. *See Fedpak,* 80 F.3d at 214; *Zerand-Bernal,* 23 F.3d at 162; *Federalpha Steel,* 341 B.R. at 881.

It is true that recent bankruptcy decisions from the Third Circuit addressing "related to" jurisdiction have found post-confirmation jurisdiction over state law claims assigned to a liquidating trust. *See, e.g., AstroPower Liquidating Trust v. Xantrex Tech., Inc. (In re AstroPower Liquidating Trust),* 335 B.R. 309, 323-25 (Bankr. D. Del. 2005). These decisions, however, necessarily employ the Third Circuit's analysis of "related to" jurisdiction. That analysis is more lenient than the Seventh Circuit's "narrow view," *Doctors Hosp. of Hyde Park, Inc. v. Desnick (In re Doctors Hosp. of Hyde Park, Inc.),* 308 B.R. 311, 317 (Bankr. N.D. Ill. 2004), and has been expressly rejected here, *see Fedpak,* 80 F.3d at 213-14 (criticizing the Third Circuit's concept of "related to" jurisdiction as too broad). Under the view that holds sway in this circuit, Count I is not "related to" the bankruptcy. *See Federalpha Steel,* 341 B.R. at 879-82 (dismissing liquidating trust's post-confirmation state law claims for lack of jurisdiction).

Because the claim in Count I is not "related to" the CLC bankruptcy, the court lacks jurisdiction to hear that claim. Count I will be dismissed.[8]

---

[8]      As the court has observed before, a dismissal on this basis can be criticized as formalistic, even "hyper-technical." *See Federalpha Steel,* 341 B.R. at 882 n.6. As the court has

### b. Counts II and III

Counts II and III, on the other hand, will not be dismissed.[9]  Regardless of the theoretical

basis for requiring some level of specificity when a chapter 11 plan reserves claims for later

adjudication, the defendants are in no position to object to the reservation in the plan here.

What constitutes an effective reservation of claims in a chapter 11 plan is a controversial

question. *See generally* David R. Kuney, *Liquidating Trusts and the Quagmire of Post-*

*Confirmation Jurisdiction:  The Case of the Disappearing Estate*, 14 J. Bankr. L. & Prac. 85

(2005); Bruce H. White & William L. Medford, *Post-Confirmation Standing and Estoppel:  How*

*Much Disclosure Is Necessary?*, Am. Bankr. Inst. J., May 2005, at 38.  The only area of

agreement is that a plan can in fact reserve claims for later adjudication.  Section 1123(b)(3)(B)

leaves no room for argument on that score:  it says a plan may "provide for . . . the retention and

enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such

---

also observed, however, the dismissal is mandated under this circuit's definition of "related to"
jurisdiction. *See id.*  "Should sensible bankruptcy policy warrant a departure" from that
definition when a liquidating trust prosecutes a state law claim post-confirmation, "the court of
appeals will have to say so."  *Id.*  Until then, the decisions of that court are binding and must be
followed. *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004)
(reminding the district court that in a hierarchical system trial judges in the Seventh Circuit "must
follow the decisions of this court whether or not they agree").

[9]        The court has subject matter jurisdiction over the claims in Counts II and III,
unlike the claim in Count I, because the claims in these counts "arise under" title 11.  11 U.S.C.
§ 1334(b).  Count II is a claim under 11 U.S.C. § 542(a) for turnover of SNR's prepetition
retainer.  Count II alleges that SNR's retainer was "unearned," and a claim to recover an
unearned retainer typically arises under state law. *See, e.g., Simon v. Auler*, 155 Ill. App. 3d
1000, 1003, 508 N.E.2d 1102, 1104 (4th Dist. 1987).  However, Count II also alleges that SNR
was never formally retained as CLC's counsel in the bankruptcy, giving rise to a claim under
section 542(a) of the Code for turnover of any compensation paid to SNR in connection with the
case. *See In re WDS, Inc.*, 336 B.R. 301, 302-04 (Bankr. W.D. Ky. 2006).  Count III, meanwhile,
is a fraudulent transfer claim plainly arising under 11 U.S.C. § 548(a)(1)(b)(ii)(II):  it alleges that
CLC received less than "reasonably equivalent value" for its payments to SNR in connection
with SNR's representation of Hueser, and that CLC was insolvent when it made the payments.

-12-

purpose, of any . . . claim or interest [belonging to the debtor or to the estate]." 11 U.S.C. §
1123(b)(3)(B). But whether the reservation must be specific – and if so, how specific and why –
are matters on which courts are deeply split.

Courts fall into roughly three analytical camps. The first maintains that no specificity is
necessary: a general reservation of claims is enough. *See, e.g., In re Weidel,* 208 B.R. 848, 852-
53 (Bankr. M.D.N.C. 1997); *see also In re Bleu Room Experience, Inc.,* 304 B.R. 309, 315
(Bankr. E.D. Mich. 2004) (approving general reservation of right to object to claims). The
remaining two camps require specificity but differ on why, legally, specificity is necessary. One
bases the requirement on section 1123(b)(3)(B) itself, which is said to serve a "notice" function.
*See, e.g., Harstad v. First Am. Bank,* 39 F.3d 898, 902-03 (8th Cir. 1994); *Moecker v. Johnson
(In re Transit Group, Inc.),* 332 B.R. 45, 57-58 (Bankr. M.D. Fla. 2005); *Kaye v. A.R.E.
Distribution & Alpine Records, LLC (In re Value Music Concepts, Inc.),* 329 B.R. 111, 118-19
(Bankr. N.D. Ga. 2005). The other relies on *res judicata,* concluding that claims must be
specified to avoid the preclusive effect of a confirmed plan.[10] *See, e.g., Browning v. Levy,* 283
F.3d 761, 772-75 (6th Cir. 2002); *Alary Corp. v. Sims (In re Associated Vintage Group, Inc.),*
283 B.R. 549, 554-64 (B.A.P. 9th Cir. 2002); *SouthTrust Bank, N.A. v. WCI Outdoor Prods., Inc.
(In re Huntsville Small Engines, Inc.),* 228 B.R. 9, 13 (Bankr. N.D. Ala. 1998).

Courts that require specificity are also split on how much specificity is required. Some

_____

[10]      These are the major approaches, not the only ones. Courts have occasionally
addressed the reservation of claims as a question of judicial estoppel, *see, e.g., Rosenshein v.
Kleban,* 918 F. Supp. 98, 103-04 (S.D.N.Y. 1996), and of equitable estoppel, *see, e.g., Heritage
Hotel L.P. I v. Valley Bank of Nev. (In re Heritage Hotel L.P. I),* 160 B.R. 374, 378-79 (B.A.P.
9th Cir. 1993) (finding claim barred on both *res judicata* and equitable estoppel grounds). At
least one court has considered the question as a matter of contract law. *See Connolly v. City of
Houston (In re Western Integrated Networks, LLC),* 322 B.R. 156, 160-61 (Bankr. D. Colo.
2005) (noting that "as a contract, a chapter 11 plan must be sufficiently specific and certain").

demand that the plan precisely identify each claim and prospective defendant. *See, e.g.,*

*Browning,* 283 F.3d at 774-75; *Tracar, S.A. v. Silverman (In re American Preferred Prescription,*

*Inc.),* 266 B.R. 273, 277-79 (E.D.N.Y. 2000); *Huntsville,* 228 B.R. at 13. Others – probably the

majority – are satisfied with something less, such as a statement of the categories or kinds of

claims reserved. *See, e.g., Associated Vintage,* 283 B.R. at 563; *Transit Group,* 332 B.R. at 56

(declaring that "minutiae [are] not necessary" in reservations); *Value Music,* 329 B.R. at 119; *Ice*

*Cream Liquidation, Inc. v. Calip Dairies, Inc. (In re Ice Cream Liquidation, Inc.),* 319 B.R. 324,

337-38 (Bankr. D. Conn. 2005); *Elk Horn Coal Co. LLC v. Conveyor Mfg. & Supply, Inc. (In re*

*Pen Holdings, Inc.),* 316 B.R. 495, 504-05 (Bankr. M.D. Tenn. 2004) (decrying an insistence on

"magic words" in claims reservations and adopting a case-by-case approach); *Cohen v. TIC Fin.*

*Sys. (In re Ampace Corp.),* 279 B.R. 145, 160-61 (Bankr. D. Del. 2002).

The Seventh Circuit is on all sides of the debate. In *D & K Properties,* the court

considered whether a provision in the debtor's confirmed plan reserving enforcement of "all

causes of action existing in favor of the Debtor" authorized the debtor to bring a post-

confirmation breach of contract action. *D & K Properties,* 112 F.3d at 259. The defendant in the

action moved to dismiss on the ground that the claim was inadequately reserved, and the district

court granted the motion. The court of appeals affirmed. Analyzing the issue under *res judicata*

principles, the court held that the *res judicata* effect of a confirmed plan can be avoided only if

the claim reserved in the plan is identified in the reservation. *Id.* at 261. Not only must the

identification be "express," the court said, the claim must be "specifically identified." *Id.* "A

blanket reservation that seeks to reserve all causes of action reserves nothing." *Id.* Because D &

K "failed to identify any claim it was reserving," its breach of contract claim was barred. *Id.*

The next year, however, the Seventh Circuit took a different tack with *P.A. Bergner &*

-14-

*Co. v. Bank One, Milwaukee, N.A. (In re P.A. Bergner & Co.),* 140 F.3d 1111 (7th Cir. 1998). In

*Bergner,* the defendant in the debtor's preference action complained that the claim had not been

specifically reserved in the confirmed plan and so was barred. The reservation waived all

avoidance actions as of the date the disclosure statement was approved, "other than any such

actions that may be pending on such date." *Id.* at 1117. But the bankruptcy and district courts

found the reservation adequate, and the court of appeals agreed – without once citing *D & K*

*Properties* or mentioning *res judicata.* Analyzing the reservation as a question of notice under

section 1123(b)(3)(B), the court concluded that the plan's reservation satisfied the notice function

of that section, given that the preference action was "pending" when the disclosure statement was

approved and the defendant had been vigorously defending the action. *Id.* The court rejected the

idea that a reservation of claims must be "specific and unequivocal," noting that "the statute itself

contains no such requirement." *Id.* Instead, the court suggested, a reservation is sufficient as

long as it retains "claims of a given type." *Id.*

Reconciling *D & K Properties* with *Bergner* is no easy task. *But see Kmart Corp. v.*

*Intercraft Co. (In re Kmart Corp.),* 310 B.R. 107, 124 n.8 (Bankr. N.D. Ill. 2004) (stating that

"the holdings of *Bergner* and *D & K Properties* are not contradictory, but can be read together to

arrive at the proper linguistic parameters of a plan retention provision"). Fortunately, no

reconciliation is necessary here. Nor is it necessary to weigh in on the larger questions: how

much specificity a debtor must employ in reserving claims in its plan, and what analytical

approach (if any) to claims reservation is correct. No matter which of the two major approaches

applies, the defendants in this case have no right to contest the adequacy of the reservation in the

CLC Plan.

The defendants are in no position, first of all, to raise a *res judicata* defense. Under

-15-

federal law (which applies here), *res judicata* has three requirements: "(1) a final judgment on

the merits in an earlier action, (2) an identity of the cause of action in both the earlier and later

suit, and (3) an identity of parties or privies in the two suits." *Tartt v. Northwest Cmty. Hosp.*,

453 F.3d 817, 822 (7th Cir. 2006) (internal quotation omitted). The third element is essential: a

prior judgment is binding only on parties and those in privity with them. *See Beard v. O'Neal*,

728 F.2d 894, 897 (7th Cir. 1984); *see generally* 18A Charles Alan Wright, Arthur R. Miller &

Edward R. Cooper, *Federal Practice & Procedure* § 4464.1 (2002) (noting that with limited

exceptions there is no such thing as non-mutual claim preclusion). Although privity is "an

elusive concept," *In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993), it generally refers to

"those with a sufficiently close identity of interests," *People Who Care v. Rockford Bd. of Educ.*,

68 F.3d 172, 177 (7th Cir. 1995).

SNR and the individual defendants were not parties to the CLC bankruptcy, let alone

participants in the confirmation of the Plan. The defendants were not the debtor, of course. But

neither were they creditors: the court's claims register reflects no proof of claim filed on their

behalf, and it is unclear what would have entitled them to file one. SNR and the individual

defendants were not in privity with a party, either. It is true that two non-defendant SNR lawyers

filed CLC's petition and schedules, and that counsel for a party has sometimes been deemed in

privity with that party for *res judicata* purposes. *See Henry v. Farmer City State Bank*, 808 F.2d

1228, 1235 n.6 (7th Cir. 1986). But neither SNR nor any individual SNR lawyer (let alone the

individual defendants here) ever applied for retention as debtor's counsel, and so their retention

was never approved. The defendants therefore never served as CLC's counsel in the bankruptcy.

It is hard to see what "close identity of interests" with CLC the defendants could have in any

event. *People Who Care*, 68 F.3d at 177.

-16-

Because they were neither parties to the CLC bankruptcy nor in privity with any party, the defendants are essentially strangers to the case. They cannot defeat the Trust's action by arguing that the Plan inadequately described the claim against them and so is barred by *res judicata*. *See Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp., I)*, 333 B.R. 506, 533 (Bankr. D. D.C. 2005) (noting that debtor's prepetition law firm could not raise a *res judicata* defense to a liquidating trust's malpractice claim because the firm "was not a party in interest with respect to the plan"); *see also JP Morgan Trust Co., N.A. v. Mid-America Pipeline Corp.*, 413 F. Supp. 2d 1244, 1278 n.19 (D. Kan. 2006) (expressing doubt that defendants could assert *res judicata* when they "were not creditors of the estate and thus presumably would not have participated in the plan confirmation proceeding"); *LJM2 Co-Inv., L.P. v. Dodson (In re LJM2 Co-Inv., L.P.)*, 327 B.R. 786, 792 (Bankr. N.D. Tex. 2005) (holding *res judicata* defense unavailable where the defendant to an avoidance action "was not a party to the LJM2 bankruptcy case").[11]

The defendants are in no better position to assert a notice objection to the claims reservation based on section 1123(b)(3)(B). The rationale underlying the section 1123(b)(3)(B) approach is that a *creditor* in the bankruptcy is entitled to know about claims that will be pursued post-confirmation under the proposed plan, either because those claims might "enlarge the estate," *Harstad*, 39 F.3d at 903, or because the claims might be aimed at the creditor himself,

---

[11]      In *Browning v. Levy*, 283 F.3d 761 (6th Cir. 2002), the court reached the opposite result, concluding that a post-confirmation action against debtor's counsel was barred because counsel were "participants in the proceeding for the purposes of res judicata." *Id.* at 772. The dubiousness of the legal conclusion aside, the facts that caused the court to reach that conclusion are different from the facts here. In *Browning*, the defendant law firm's retention as counsel for the debtor apparently was approved, and even after the firm's replacement one month after the petition was filed counsel "remained as special counsel [to the debtor] throughout the proceeding." *Id.* Here, SNR's retention was never approved, and after some initial filings the firm had no further involvement in the case.

*Kelley*, 199 B.R. at 703. Armed with this information, so the theory goes, the creditor can

"adjust its vote accordingly." *Goodman Bros. Steel Drum Co. v. Liberty Mut. Ins. Co. (In re*

*Goodman Bros. Steel Drum Co.)*, 247 B.R. 604, 608 (Bankr. E.D.N.Y. 2000); *see also Harstad,*

39 F.3d at 903; *Kelley*, 199 B.R. at 703.

This rationale disappears entirely, however, when the defendant in a post-confirmation

action is not a creditor. Specific or general, adequate or inadequate, notice to a non-creditor

about claims reserved in a proposed plan serves no purpose because a non-creditor cannot vote

on whether the plan should be confirmed. *See Transit Group*, 332 B.R. at 57; *Pen Holdings*, 316

B.R. at 504 (stating that section 1123(b)(3)(B) "is not designed to protect defendants from

unexpected lawsuits"); *KMart*, 310 B.R. at 120 (noting that a plan's retention provision "is

directed towards the estate's creditors, not the potential defendants on the reserved claims").

SNR and the individual defendants were not creditors in the CLC bankruptcy. Therefore, they

cannot invoke the protections of section 1123(b)(3)(B) and dispute the adequacy of notice in the

CLC Plan. *See Cooper v. Tech Data Corp. (In re Bridgeport Holdings, Inc.)*, 326 B.R. 312, 327

(Bankr. D. Del. 2005) (denying motion to dismiss a liquidating trust's complaint based on

section 1123(b)(3)(B) in part because the defendant was "not a creditor of the Debtor's estates").

In short, whether the correct legal analysis is *res judicata*, as *D & K Properties* suggests,

or notice under section 1123(b)(3)(B), as *Bergner* holds, the defendants in this action are not

entitled to deny the adequacy of the Plan's reservation of claims.

It may be worth noting, finally, that the defendants would be hard-pressed to prevail on

their argument even under a standard requiring the reservation of specific claims against specific

defendants. Article XIX of the CLC Plan is admittedly a blanket reservation of claims; standing

alone, it would be insufficient under both *D & K Properties* and *Bergner*. But a confirmed plan

is a contract, *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753, 755 (7th Cir. 2002); *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 962 (7th Cir. 1999), or at least "contract-like," *Siemens Energy & Automation, Inc. v. Good (In re Heartland Steel, Inc.)*, 389 F.3d 741, 745 (7th Cir. 2004). As such, it is subject to principles of contract interpretation, and state law supplies the rules of decision. *KMart*, 310 B.R. at 125 (citing *D & K Properties*, 112 F.3d at 262); *see also In re Harvey*, 213 F.3d 318, 320 (7th Cir. 2000) (discussing chapter 13 plans); *McFarland v. Leyh (In re Texas Gen. Petroleum Corp.)*, 52 F.3d 1330, 1335 (5th Cir. 1995); *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 588 (9th Cir. 1993).

Under Illinois law, contractual provisions are not considered standing alone. Contracts are read as a whole. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1038 (7th Cir. 1998); *Schwinder v. Austin Bank of Chi.*, 348 Ill. App. 3d 461, 474, 809 N.E.2d 180, 193 (1st Dist. 2004). Moreover, a contract can incorporate another document by reference if the contract shows a clear intention to do so. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002); *Jago v. Miller Fluid Power Corp.*, 245 Ill. App. 3d 876, 879, 615 N.E.2d 80, 82 (1st Dist. 1993); *Wilson v. Wilson*, 217 Ill. App. 3d 844, 853, 577 N.E.2d 1323, 1329 (1st Dist. 1991). If incorporated, the document becomes "as much a part of the contract as if [its provisions] were expressly written in it." *Wilson*, 217 Ill. App. 3d at 853, 577 N.E.2d at 1329.

Though Article XIX of the CLC Plan may be too general to serve as a valid reservation, other provisions of the Plan do the job. Section 9.7 of Article IX confers on the Trust the power to commence "any preference, fraudulent conveyance or other litigation (collectively referred to as the 'Avoidance Actions')" and then states that "these Avoidance Actions are identified in the Disclosure Statement filed by the Plan Proponents." The last paragraph of the Plan's Preamble similarly provides: "For a complete discussion of the mechanics of this Plan . . . , the reader's

-19-

attention is directed to the Disclosure Statement filed by the Plan Proponents in connection with

this Plan." These provisions show a clear intent to incorporate the Disclosure Statement into the

Plan.[12]

The Disclosure Statement, in turn, contains a detailed, six-page chart of "potential causes

of action to be brought by the Creditors' Trust." The chart includes the following item:

| DEFENDANT | NATURE OF CLAIM |
| --- | --- |
| Sonnenschein, Nath & Rosenthal | Recovery of Unearned Pre-petition Retainer paid by Debtor; Fraudulent conveyance; claims to recover fees paid by Debtor on account of representation of Peter Hueser; negligence and related claims |

This description meets even the strictest, *D & K Properties* standard for claims reservations. Had

the defendants been entitled to notice, then, the notice given here would have been more than

sufficient.[13] *Cf. Katz v. I.A. Alliance Corp. (In re I. Appel Corp.),* 300 B.R. 564, 570 (S.D.N.Y.

2003) (finding adequate a "blanket reservation of claims in the Plan and the reference to potential

claims . . . in the Disclosure Statement"); *Transit Group,* 332 B.R. at 57-58 (finding reservation

---

[12]      The Plan incorporates the Disclosure Statement despite the merger clause in
paragraph 20.1 of Article XX. A merger clause is "strong evidence that the parties intended the
writing to be the complete and exclusive agreement between them," *Rosenblum v.
Travelbyus.com Ltd.,* 299 F.3d 657, 665 (7th Cir. 2002) (internal quotation omitted), and the
presence of such a clause precludes the use of parol evidence to vary the terms of the agreement,
*Air Safety, Inc. v. Teachers Realty Corp.,* 185 Ill. 2d 457, 464, 706 N.E.2d 882, 885 (1999). But
a document incorporated by reference into a written contract is not parol evidence; it is part of
the contract itself. *See, e.g., Galey v. World Mktg. Alliance,* No. 4:04CV323, 2006 WL 1716871,
at *1 (N.D. Miss. June 19, 2006).

[13]      SNR in fact received notice, interestingly enough. Though never approved as
counsel for CLC, SNR remained on the service list for the case and was served, not only with the
Disclosure Statement eventually approved and Plan ultimately confirmed, but with every draft
disclosure statement and plan filed with the court from October 2004 through the confirmation
hearing in December 2004. If a notice objection rings hollow coming from a non-creditor, it
rings especially hollow when the non-creditor received notice.

sufficient based on discussion of claims in the disclosure statement as well as in the plan);
*Bridgeport Holdings,* 326 B.R. at 327 (same); *Value Music,* 329 B.R. at 120-21 (same); *Pen Holdings,* 316 B.R. at 504 (same).

Because the defendants have no right to quarrel with the claims reservation in the CLC Plan on *res judicata* or notice grounds, and because the reservation appears to have adequately reserved the claims against these defendants, the motion to dismiss Counts II and III of the Trust's complaint will be denied.

### 4. Conclusion

For the foregoing reasons, the motion of defendants Sonnenschein Nath & Rosenthal LLP, Kenneth G. Kolmin, Gordon P. Paulson, and Thomas McQueen to dismiss the complaint of plaintiff CLC Creditors' Grantor Trust is granted in part and denied in part. The motion is granted as to Count I, and Count I is dismissed for lack of subject matter jurisdiction. As to Counts II and III, the motion is denied. A separate order will be entered in accordance with this opinion.

Dated: March 14, 2007

A. Benjamin Goldgar
United States Bankruptcy Judge

-21-